# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00662-CV

---

### M. F. R.-E., Appellant

v.

### Texas Department of Family and Protective Services, Appellee

---

**FROM THE 21ST DISTRICT COURT OF BASTROP COUNTY**
**NO. 21-20677, THE HONORABLE BENTON ESKEW, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

M.F.R.-E. (Mother) appeals from the trial court's decree terminating her parental rights to G.N.M.-E. (Daughter), who was six years old at the time of trial.[1] *See* Tex. Fam. Code § 161.001(b). Mother challenges the legal and factual sufficiency of the evidence supporting termination under the predicate statutory grounds and supporting the best interest finding.[2] We affirm the trial court's termination decree.

---

[1] For the child's privacy, we will refer to her by an alias and to her family members by their relationships to her or by aliases. *See* Tex. R. App. P. 9.8.

[2] The trial court also terminated the parental rights of E.M., the alleged father of Daughter, finding that (1) Father is known but did not register with the paternity registry and could not be located pursuant to Section 161.002(b) of the Texas Family Code, and (2) that termination was in the best interest of Daughter. Father has not appealed that determination.

## BACKGROUND

The underlying removal proceeding began when the Texas Department of Family and Protective Services (Department) received a referral alleging possible physical abuse and neglectful supervision by Mother and J.J.A., her boyfriend (Boyfriend). On April 21, 2021, Mother asked Boyfriend to discipline Daughter for lying while Mother was at work. Boyfriend struck Daughter several times on her buttocks, leaving bruises on her lower back and buttocks; those injuries led to the referral. During the investigation, Daughter also disclosed that Mother had previously hit her with a belt, leaving marks on her arm. Following its initial investigation, the Department sought and obtained emergency removal of Daughter from Mother. Daughter was initially placed in a kinship household recommended by Mother, but Daughter was subsequently moved into her current foster placement because of concerns that Daughter was being abused in the kinship placement.

Contemporaneous with the removal, Mother requested Boyfriend move out from their shared living space, although Mother did not end their relationship until approximately November 2021. Mother was indicted on August 3, 2021, on third-degree felony charges for injury to a child for the injuries to Daughter; she remained incarcerated until March 2022. During the same period, Boyfriend was also indicted on charges for felony injury to a child.

On August 30, 2022, the final bench trial commenced. At the hearing, the trial court heard testimony from Brook McIntyre, Department supervisor; Hillary Bernhard, conservatorship caseworker; Rhonda Caffee, Daughter's therapist; A.S., Daughter's foster mother in her current placement (Foster Mother); Mother; and Mary Moody, the court-appointed volunteer advocate (CASA).

Brook McIntyre testified about the Department's initial investigation of the physical abuse against Daughter. McIntyre testified that Daughter was removed after investigation revealed "abrasions on the child's bottom, bruising on her arm, bruising on her forehead and right side of her face," which occurred from physical abuse by Mother and Boyfriend.[3] McIntyre testified that the abuse occurred more than once, that in previous incidents Boyfriend had spanked and punched Daughter, and that there was a previous Department investigation for physical abuse involving the same parties (although Daughter was not removed then). She also testified that Mother had requested Boyfriend discipline Daughter and that Mother appeared to have "full knowledge that abuse and neglect was occurring through [Boyfriend]"; McIntyre later clarified that she did not know whether Mother was physically present when Boyfriend abused Daughter. She further testified that Daughter made an outcry that both Mother and Boyfriend were physically abusing her, and McIntyre cautioned that the physical abuse had a "long-standing [traumatic] impact" on Daughter. On cross-examination, McIntyre also relayed that she had been advised Mother had completed her services.

Hillary Bernhard then testified regarding the conservatorship of Daughter and that termination was in the best interest of Daughter. Bernhard testified that the Department became involved "due to physical violence towards [Daughter], excessive discipline." She testified that a service plan was created for Mother but that currently there is no visitation schedule for Mother; she explained that the Department does not do visitations for incarcerated parents, and after Mother was released, no child therapist had recommended visitation begin between Mother and Daughter. Bernhard testified that Daughter stated she did not want to see Mother, and a

---

[3] The trial court also admitted photographs of the described injuries.

psychological evaluation of Daughter recommended she have no contact with Mother at this time. Bernhard testified that Daughter told her that Mother had struck Daughter with a belt. She further testified that Daughter had been traumatized by Mother, Boyfriend, and her initial kinship home placement and that "[i]t could not have been easy for [Daughter] to experience so much physical abuse at such a young age from people that were caring for her."

Bernhard also testified that Daughter's home country is Honduras but that the Department is not aware of any proper placement there. Bernhard testified that Mother has been working with a therapist and attending parenting classes on discipline, but she has not yet been successfully discharged and had not completed her service yet.[4] She described the ongoing safety concerns regarding Mother because of Mother's pending criminal charge and her uncertain immigration status, noting that the pending felony charge includes the possibility of deportation. Bernhard stated that Mother was currently employed and living in a home that was "minimal[ly]" clean but expressed concerns about the stability of Mother's housing if she went to prison or was deported.

Rhonda Caffee testified that she began therapy sessions with Daughter in June 2021 and had twice-weekly sessions with Daughter starting in August. Caffee testified that she diagnosed Daughter with specified disruptive impulse-control disorder and post-traumatic stress disorder. Caffee testified she did not recommend visitations with Mother, explaining that Daughter has clearly stated she does "not want to ever see [her] mother again." Caffee stated

---

[4] Bernhard explained that the service plan required Mother to demonstrate appropriate interactions and create a support network, but Mother had failed to complete those steps. She also stated that the two potential familial placement options offered by Mother either had a "concerning" Department history or declined to participate in a home study.

that this reaction was "highly unusual" and that usually children want to see their birth parents, especially in a safe setting, "no matter what the abuse."

Caffee testified that Daughter initially had "very concerning" self-harm outbursts before starting therapy but has made "tremendous progress," with Daughter talking "a lot about how she feels very, very safe with her foster family." Caffee stated that the foster parents are trained in trauma-related therapy and are very engaged. Caffee described Daughter as bright, having a "verbal capacity" that is "well beyond a six-year-old," and having an "unusual awareness about her particular situation." Caffee testified that Daughter is still extremely anxious, does not trust things would be different with Mother now, and has a hard time trusting because "her trust was completely betrayed by the birth parents." Caffee also relayed that Daughter told her, "I do not feel safe with my mother or any of those other people in my family, and I don't want to see them again." She also relayed Daughter's descriptions of the physical abuse she suffered, including when Mother had hurt her "really bad with the arm," that her Mother would often have Boyfriend punish Daughter when Daughter did something wrong, and that Boyfriend would hit Daughter with a belt; Daughter emphasized that the belt buckle "really, really hurt me" and that she was hit with a belt multiple times. Caffee also testified that Daughter told her that Mother would do "something with her throat" if Daughter ate too slowly and Daughter thought "she was going to choke and she was going to die," and that Mother had once hit her with "a heavy book on her spine." Caffee testified that Daughter being reintroduced to her Mother would be "extremely traumatic" for Daughter, that Daughter would need therapy for years because of her trauma.

Foster Mother testified that she has been trained in trust-based relationship intervention and that she and her husband were committed to the long-term care of Daughter.

5

She described Daughter's "huge meltdowns" involving self-harm when she was originally placed with them but that Daughter has since made "extreme progress" and now demonstrates an ability to self-regulate. Foster Mother stated that Daughter is regularly attending therapy, is attending school without incident, has "tons of friends," and has expressed a desire to "stay with us forever and ever." She also testified that Daughter had repeatedly described the physical abuse by Mother, including demonstrating that Mother had punched her with a closed fist "on her arm, on her back, a number of places." Daughter also told Foster Mother that she had been hit by Boyfriend too.

Mother testified that she did not want to invoke her Fifth Amendment privilege, and she conceded that the removal happened because of her "wrong actions," including spanking Daughter. Mother explained that she was raised in Honduras, that "family violence has been in [my family] my whole life," that her mother would beat her and her brother leading her to believe that physically hitting children was normal, but that she has taken classes and learned "there's a difference between discipline and just hitting or hurting somebody, especially a kid." Mother testified that she was attending therapy once a week and wanted Daughter returned. Mother testified that she was in jail for ten months, but since release she has established housing and been working steadily. Mother testified that once, during Daughter's previous placement, Daughter "was crying out to [Mother] and she told [Mother] she wanted to stay with me." Mother testified that the Department told her Daughter "doesn't want to see me," but she wants some kind of interaction with Daughter. She also testified that the best thing for Daughter is to be with her mother, and that Mother had done everything required of her—drug tests, classes— "because I really want her back."

6

Mother confirmed that she asked Boyfriend to discipline Daughter, but she never directly saw Boyfriend hit Daughter. Mother also denied that she ever punched Daughter, and she denied seeing Daughter's black eye or telling investigators that Boyfriend had punched Daughter in the face. But Mother also conceded that the way she hit Daughter in the past was inappropriate. Mother admitted that she told her therapist that she had beat Daughter and had "spanked" Daughter with a belt; she later clarified that she caused the bruise to Daughter's arm when she hit Daughter with a belt twice (although Mother denied hitting Daughter with the buckle). She also testified she did not know whether Boyfriend used a belt to discipline Daughter, but that he did spank her butt. Mother explained that when she was working, she left Daughter with Boyfriend; at the time she believed this was a good idea because they had a "good" relationship. Mother testified that Boyfriend explained that the bruise on Daughter's face was caused by Daughter's "trying to move" from Boyfriend when he was spanking her and she hit herself on the bed. Mother stated that she learned what happened after she saw Daughter crying, that police became involved, and that she now believes it was not a good idea because how Boyfriend spanked Daughter was "not the right way." Mother confirmed that she was no longer in a relationship with Boyfriend, although she admitted she remained in a relationship with him for approximately six months after the termination proceeding began in April 2021. Mother also testified that she does not intend to hit Daughter in the future.

On cross-examination, Mother conceded that she is facing a third-degree felony for injury to a child with a range of punishments including possible incarceration, but she stated she had been offered deferred adjudication. Mother admitted that she believed the allegations in her criminal case were true and that she committed felony endangerment of a child. Mother also admitted that she believed the allegations against Boyfriend for felony injury to a child are true

7

and that Boyfriend committed that offense. She also testified that she had applied for asylum when she entered the United States, and her immigration attorney expressed concern that the criminal matter would affect Mother's application.

Finally, Mary Moody from CASA recommended that Daughter remain with the foster placement because she is in a "stable" and "healthy environment right now." Moody also testified that termination was in Daughter's best interest because Daughter "never wanted to go back with her mom" because she hurt her. Moody clarified on cross-examination that Daughter was doing well when she attended therapy; she also testified that CASA often seeks reunification but must ultimately look out for the best interest of the child.

At the conclusion of trial, the district court terminated Mother's and Father's parental rights. The district court signed an order of termination on September 8, 2022, finding by clear and convincing evidence that Mother had: (1) knowingly placed or knowingly allowed Daughter to remain in conditions or surroundings which endangers her physical or emotional well-being, and (2) engaged in conduct or knowingly placed Daughter with persons who engaged in conduct which endanger her physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). The district court also found by clear and convincing evidence that termination of Mother's parental rights was in the best interest of Daughter. *See id.* § 161.001(b)(2). This appeal by Mother followed.

**STANDARD OF REVIEW**

To terminate the parent-child relationship, a court must find by clear and convincing evidence that (1) the parent has committed one of the enumerated statutory grounds for termination and (2) it is in the child's best interest to terminate the parent's rights. Tex. Fam.

8

Code § 161.001(b).  Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  *Id*. § 101.007.  Mother challenges both the legal and factual sufficiency of those findings.

"The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered."  *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).  When determining legal sufficiency, we consider whether "a reasonable factfinder could form a firm belief or conviction that the finding was true" when the evidence is viewed in the light most favorable to the factfinder's determination and undisputed contrary evidence is considered.  *Id*. at 631.  When determining factual sufficiency, we consider whether "in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true."  *Id*.  We must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses."  *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *see also In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

However, "an appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt."  *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).  "While parental rights are of constitutional magnitude, they are not absolute."  *Id*.  "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."  *Id*.

9

**DISCUSSION**

In her first and second issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings under Subsections (D) and (E). In her third issue, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's best interest finding.

*Statutory-Predicate Grounds*

Subsection (D) "focuses on the child's environment and may be utilized as a ground for termination when the parent has 'knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child.'" *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) (quoting Tex. Fam. Code § 161.001(b)(1)(D)). Subsection (E) focuses on a parent's conduct and "allows for termination of parental rights if clear and convincing evidence supports that the parent 'engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.'" *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam) (quoting Tex. Fam. Code § 161.001(b)(1)(E)).

For both the child's environment under Subsection (D) and the parent's conduct under Subsection (E), "endanger" means "to expose to loss or injury; to jeopardize." *In re J.W.*, 645 S.W.3d at 748 (quoting *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "'[E]ndanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, [but] it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Boyd*, 727 S.W.2d at 533); *see also A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied).

10

When considering whether a parent knowingly placed or allowed the child to remain in an endangering environment under Subsection (D), "[t]he child's environment refers to the suitability of the child's living conditions as well as the conduct of parents or others in the home." *In re E.A.R.*, 583 S.W.3d 898, 908 (Tex. App.—El Paso 2019, pet. denied). "A child is endangered when the environment creates a potential for danger and the parent is aware of the danger but consciously disregards it." *In re J.E.M.M.*, 532 S.W.3d 874, 881 (Tex. App.—Houston [14th Dist.] 2017, no pet.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home under [Sub]section D." *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Moreover, "[a] single act or omission can support termination under subsection (D)." *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.).

When considering whether a parent's conduct was endangering under Subsection (E), "the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omission or failure to act." *C.B. v. Texas Dep't of Fam. & Protective Servs.*, 458 S.W.3d 576, 582 (Tex. App.—El Paso 2014, pet. denied); *see also S. R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00142-CV, 2021 WL 3437891, at *1 (Tex. App.—Austin Aug. 6, 2021, no pet.) (mem. op.). "Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *C.B.*, 458 S.W.3d at 582.

11

As set forth above, multiple witnesses testified that Daughter had identified both Mother and Boyfriend as physically abusing her. McIntyre testified that Daughter made an outcry to the Department about the physical abuse she suffered from both Mother and Boyfriend, including specifically that Mother had hit Daughter. McIntyre further testified that the abuse by Boyfriend occurred more than once, that Mother was also physically abusive of Daughter, and that Mother had admitted Boyfriend had punched Daughter in the face. Bernhard testified that the Department became involved with Daughter because of the "excessive discipline" and physical violence directed towards Daughter. Caffee testified that Daughter disclosed in therapy that Mother had hurt Daughter "really bad with the arm" and that Mother would have Boyfriend punish Daughter when Daughter did something wrong and those punishments included Boyfriend hitting Daughter with a belt. Caffee also testified that Mother had also done "something with [Daughter's] throat" when Daughter had eaten too slowly which made Daughter believe "she was going to choke and she was going to die," and that Mother had also hit Daughter with "a heavy book on her spine" for an undisclosed reason. Foster Mother testified that Daughter disclosed to her the physical abuse by Mother, including that Mother had punched her with a closed fist "on her arm, on her back, a number of places." Photographic evidence also showed contusions and welts on Daughter's face, arm, and buttocks.

Mother disputed some of those statements, denying that she ever hit Daughter with the belt buckle, that she ever punched Daughter, or that she ever told investigators that Boyfriend had punched Daughter. Mother also, however, conceded that she caused the injury to Daughter's arm when she struck Daughter with a belt, that the way she hit Daughter in the past was "inappropriate," and that she admitted in therapy that she had hit Daughter. *See In re J.T.G.*,

12

121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) ("Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.").

Mother also contends that the record does not demonstrate she was aware of the danger presented by Boyfriend and therefore she could not have disregarded those dangers. However, Mother herself admitted that she committed felony endangerment of a child and that Boyfriend committed felony injury to a child, and she testified that she believed the allegations in her criminal case, and in Boyfriend's criminal case, were true. *See In re J.F.-G.*, 627 S.W.3d 304, 313 (Tex. 2021) ("A parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists— can support a finding of endangerment.").

Furthermore, although Mother testified that she did not see Boyfriend discipline Daughter or hit Daughter with a belt, Mother was aware that Boyfriend was disciplining Daughter. Mother and Boyfriend had previously been investigated by the Department for physical abuse of Daughter. *See In re D.R.J.*, No. 07-08-0410-CV, 2009 WL 1953402, at *7 (Tex. App.—Amarillo July 8, 2009, pet. denied) (mem. op.) (concluding that parent's knowledge of abusive conduct by spouse supported endangerment findings under Subsections (D) and (E)). Mother testified that she knew Boyfriend "used to spank [Daughter on] the butt." Mother testified that after Daughter had bruising near her eye, she asked Boyfriend what happened and Boyfriend told her he spanked Daughter and that Daughter injured herself with the bed while trying to move. Mother similarly described her past actions as "spanking" Daughter but clarified under cross-examination that after removal she learned that how she was physically disciplining Daughter was wrong and that how she had previously hit Daughter was inappropriate. *See In re A.B.*, 437 S.W.3d at 503 (explaining that we must "provide due deference to the decisions

13

of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses"). Caffee testified that Daughter suffered from specified disruptive impulse-control disorder and post-traumatic stress disorder from the trauma she experienced and that Daughter's desire to not see Mother arose from being "so betrayed and traumatized that [Daughter] does not ever want to go back to that level" and does not trust that things would be different with Mother now. *See In re A.R.O.*, 556 S.W.3d 903, 910–11 (Tex. App.—El Paso 2018, no pet.) (concluding that conduct subjecting child to life of uncertainty and instability constituted endangerment).

We conclude that this evidence is legally and factually sufficient to support the district court's finding that Mother knowingly placed or knowingly allowed Daughter to remain in conditions and surroundings which endangered her physical or emotional well-being and its finding that Mother engaged in conduct or knowingly placed Daughter with persons who engaged in conduct which endangered Daughter's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D)–(E); *In re J.W.*, 645 S.W.3d at 749; *In re J.F.-G.*, 627 S.W.3d at 315.

We overrule Mother's first and second issues.

*Best Interest Finding*

We turn to Mother's remaining issue, challenging that there was legally and factually sufficient evidence supporting the best interest finding. "[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). "In parental-termination proceedings, [the Department's] burden is not simply to prove that a parent should not have custody of [the] child;

14

[the Department] must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship with the child whatsoever." *S.B. v. Texas Dep't of Fam. & Protective Servs.*, 654 S.W.3d 246, 255 (Tex. App.—Austin 2022, pet. filed) (mem. op.) (quoting *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.)).

We consider nine non-exhaustive factors to determine whether termination is in a child's best interest: (1) the child's wishes, (2) the child's emotional and physical needs now and in the future, (3) any emotional or physical danger to the child now and in the future, (4) the parenting abilities of any parties seeking access to the child, (5) programs available to help those parties, (6) plans for the child, (7) the stability of any proposed placement, (8) any evidence that the parent-child relationship is improper, and (9) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also A.C.*, 560 S.W.3d at 631; *S.B.*, 654 S.W.3d at 255. The party seeking termination has the burden of establishing that termination is in the child's best interest. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The set of factors is not exhaustive; although one factor is not necessarily dispositive, in some instances evidence of a single factor may suffice to support the best-interest finding. *See Holley*, 544 S.W.2d at 371–72; *see also In re C.H.*, 89 S.W.3d at 27; *S.B.*, 654 S.W.3d at 255. Ultimately, the *Holley* test focuses on the child's best interest, not the parent's. *In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.). Evidence proving one or more statutory grounds for termination also can be probative evidence that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 28. On appeal, Mother's challenge to the best interest finding exclusively focuses on two of the *Holley* factors: the child's wishes and the child's emotional and physical needs now and in the future.

We first begin with the desires of Daughter. In determining best interest, this Court may consider the expressed desires of a child who is of sufficient age and maturity. *In re F.M.E.A.F.*, 572 S.W.3d 716, 732 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). Undisputed evidence in the record establishes that Daughter does not want any contact with Mother and desires to remain with her foster family. Bernhard testified that Daughter "has spoken to me about not wanting to see" Mother. Foster Mother testified that Daughter has not asked to see or call Mother and has not asked about Mother at all. Caffee testified she did not recommend visitations between Mother and Daughter for several reasons, including that "[Daughter] is very clear that she does not want to have any contact with [Mother]." Foster Mother also testified that Daughter "has repeatedly [said] she wants to stay with us forever and ever." Caffee also testified that Daughter is bright, possesses a "verbal capacity" that is "well beyond a six-year-old," and has an "unusual awareness about her particular situation." Based on this evidence, including Daughter's express and unwavering desire not to return to Mother's care and instead to remain with her foster placement, this factor favors termination.[5]

We next consider Daughter's present and future physical and emotional needs and any physical and emotional dangers to Daughter now or in the future. *See Holley*, 544 S.W.2d at 371–72. As discussed above, evidence in the record shows that both Mother and Boyfriend had

_____

[5] Mother does not dispute the evidence in the record that Daughter has repeatedly expressed her desire to not return to Mother; rather, Mother argues that we should disregard Daughter's express and repeated wishes. But Mother cites no authority or evidence in the record that Daughter lacked the capacity or ability to express her own desires. *See J. A. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00203-CV, 2018 WL 3447726, at *2 (Tex. App.—Austin July 18, 2018, no pet.) (mem. op.) (stating that inquiry into wishes of children ages seven, five, and two was "developmentally appropriate"); *Yonko v. Texas Dep't of Fam. & Protective Servs.*, 196 S.W.3d 236, 245 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (stating that nine year old was capable of expressing their love for, and desire to remain with, their parent). Even if this factor did not weigh in favor of termination, the other factors still weigh in favor of the trial court's best interest finding.

16

physically abused Daughter. Mother admitted that she directed Boyfriend to discipline Daughter and that she had caused the injury to Daughter's arm when she struck Daughter with a belt. Although Mother denied she ever punched Daughter, hit Daughter with the belt buckle, or told investigators that Boyfriend had punched Daughter, Mother also conceded that the allegations against her in her criminal case for felony endangerment of a child—and the allegations against Boyfriend in his separate criminal case for felony injury to a child—were true.

Caffee testified that Daughter told her about the physical abuse she suffered at the hands of Mother and Boyfriend, that reintroducing Mother to Daughter would be "extremely traumatic" to Daughter, and that the prospect of seeing Mother was a trigger for Daughter's self-harm outbursts. Caffee testified that Daughter had stated she did not feel safe with Mother, Boyfriend, or any kinship placement, but that Daughter now feels safe with the foster family. Caffee also cautioned that Daughter has made "tremendous progress" in her treatment since placement with the foster family.

Mother argues that she immediately began her services upon release and that she can care for the physical and emotional needs of Daughter. Mother testified that she had completed her psychological evaluation and a parenting class, attending therapy once a week, and that she did not intend to hit Daughter in the future. "However, a trial court is not bound to accept the truth or accuracy of a parent's testimony, either as to past actions or future intentions." *In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.). Furthermore, "[e]vidence of a recent improvement does not absolve a parent of a history of irresponsible choices." *In re A.M.*, 385 S.W.3d 74, 83 (Tex. App.—Waco 2012, pet. denied).

Additionally, the stability factor weighs heavily in favor of the trial court's best interest finding. "[I]t is well settled that stability and permanence are paramount considerations

17

in evaluating the needs of a child." *N.K. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00028-CV, 2022 WL 2673236, at *8 (Tex. App.—Austin July 12, 2022, no pet.) (mem. op.). "Because of the importance of stability to the physical and emotional needs of the children, evidence about the present and future placement of the [child] is relevant to the best interest determination." *In re T.R.M.*, No. 14-14-00773-CV, 2015 WL 1062171, at *10 (Tex. App.—Houston [14th Dist.] Mar. 10, 2015, no pet.) (mem. op.). Caffee testified that Daughter has made "tremendous progress" in therapy and that Daughter "talks a lot about how she feels very, very safe with her foster family." She further testified that before weekly therapy began Daughter has demonstrated "very concerning" self-harm, and that Daughter would need therapy for years because of her trauma. Caffee also emphasized that the foster parents were trained in trauma-related therapy and are very engaged with Daughter. Foster Mother testified that Daughter originally had regular outbursts that involved self-harm but has demonstrated "extreme progress" and is now able to self-regulate (although some outbursts still occur). Foster Mother also testified that Daughter is currently attending school without incident and has "tons of friends," and that the foster family is committed to the long-term care of Daughter. Moody also testified that the current foster placement was a "stable" and "healthy environment right now" for Daughter.

In contrast, the record contains substantial evidence about the instability and uncertainty of Mother as a placement. Caffee testified that Daughter told her she did "not feel safe with my mother or any of those other people in my family," that reintroducing her to Mother would be "extremely traumatic" for Daughter, and that Daughter did not trust that things would be different with Mother. Caffee also warned about the impact on Daughter's "tremendous progress" in her treatment if she were removed from her current stable environment. Bernhard

18

echoed those concerns, testifying that there were ongoing safety concerns relating to Mother because of Mother's pending criminal charge, pending immigration case, and past discipline of Daughter. Bernhard noted she had no concerns about Mother's current apartment, but that there were concerns of stable housing if Mother went to prison or was deported. Moody also testified that Daughter did not want to return to Mother because Mother had "hurt her." Mother testified that she was offered deferred adjudication on her felony charge, but she admitted that the range of punishments include possible incarceration and that her immigration attorney had expressed concern that the criminal case would affect Mother's immigration matter. Although Mother also testified about recent improvements in her housing and employment, "evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past." *See Smith v. Texas Dep't of Protective & Regul. Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.).

Reviewing the record under the appropriate standards of review and considering the relevant factors,[6] we conclude that legally and factually sufficient evidence supports the trial court's finding that termination was in the best interest of Daughter. We overrule Mother's remaining issue.

---

[6] Mother testified that during her own childhood her mother was rarely around, and that when she was around "she was just beating me up and—beating me and my little brother." Mother stated that such an experience was "normal for me" and led her to believe that physically hitting children was normal for raising kids. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (considering excuses for the parent's conduct as part of best interest determination). The trial court, however, stated "that the law in Honduras doesn't support unreasonable discipline of a child." Mother does not advance any argument on appeal that her conduct should be excused based on her own childhood experiences, and the remaining evidence outweighs any probative value this evidence has on the best interest finding.

# CONCLUSION

Having concluded there was legally and factually sufficient evidence supporting the trial court's termination under subsections (D) and (E) and overruling Mother's other issue, we affirm the trial court's final decree terminating Mother's parental rights to Daughter.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Theofanis

Affirmed

Filed:   March 9, 2023